**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-301 (TNM)** |
| **v.** | : | |
| | : | |
| **JOSHUA BORUM,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Joshua Borum has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Borum to thirty (30) days' incarceration on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.    **Introduction**

Defendant Joshua Borum, a thirty-nine-year-old preaching pastor at Windfall Christian Church in Indiana)[1] and U.S. Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of

---

[1] Borum began preaching as a pastor at Windfall in July 2023, some time following his involvement in January 6, 2021.

the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

Borum is expected to plead guilty to violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). The government's recommendation is supported by the defendant (1) wearing paramilitary tactical gear to and inside the Capitol Building (including a ballistic plate carrier, a wearable radio, a military-style multicam helmet, and sunglasses similar to military tactical goggles; (2) going to the Capitol while acting as "security" for an organization, the American Regulators; (3) seeing fencing, barricades, police presence, and chaos and still going further into Capitol grounds and the Capitol Building; (4) seemingly recording the chaos with his cellphone while inside the Capitol Building; and (5) only leaving the Capitol Building when police forced him and the mob out using crowd control tactics (including launching pepper balls and using line formations). .

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Borum's crime support a sentence of 36 months' probation, 30 days' incarceration, 60 hours of community service, and $500 in restitution in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense at 1-3.

*Defendant Borum's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Defendant Borum traveled from Windfall, Indiana, to Washington, D.C. as a member of a group named the "American Regulators."  Borum was a part of a subset of the American Regulators who were designated to provide "security" to the larger American Regulators group that would gather in Washington, D.C. and attend the rally given by then-President Donald Trump at the Ellipse.  Members of the security subset of the American Regulators were instructed to wear red and black plaid long-sleeve shirts for identification and recognition purposes.

On January 6, 2021, Borum left his D.C.-area hotel and drove into the District wearing the "security" red-and-black plaid as instructed.  In addition to that distinctive clothing, he wore military-style tactical gear: a ballistic plate carrier; a wearable radio; a combat-style multicam helmet with patches on the left (a Betsy Ross flag),  top (an American Flag), and rear (a red patch with a white emblem and a second patch with the word "APOSTLE"); and sunglasses that appeared similar to military tactical goggles.  He also wore woodland camouflage pants, tan gloves with the fingers cut off, and a grey backpack.



Image 1 - Borum outside the Capitol building

Borum attended the rally at the Ellipse and the speech given by then-President Trump.  At

or about the end of the speech, he, as part of the larger American Regulators group, proceeded to

the Capitol grounds.  Arriving at restricted Capitol grounds, Borum personally observed a

commotion at the Capitol, a fence around the Capitol lawn area, bike-rack barricades that had been

pushed past, and rioters on the steps and scaffolding at the Capitol.  Despite the chaos he observed,

Borum proceeded further onto restricted Capitol grounds, traveling up the northwest stairs to the

Upper West Terrace.

While on the Upper West Terrace, Borum saw police officers present on the Capitol

grounds, yet he still proceeded closer to the Capitol Building.  Although the Capitol Building had

been first breached prior to Borum's arrival, after he arrived, he saw rioters entering and exiting the broken-open doors of the Capitol Building.  While in the Northwest Courtyard, Borum joined a crowd of rioters pushing their way up a small set of stairs leading to the Senate Parliamentarian Door, a fire exit.  Third-party video in the Courtyard showed the damage done to windows near the Parliamentarian Door, which were bashed and broken, and a shrill alarm could be heard blaring loudly from inside the building.

At approximately 2:56 p.m., Borum entered the Capitol Building through the Senate Parliamentarian Door.



Image 2 – Borum (circled in yellow) entering the Capitol building through the Senate Parliamentarian Door

Borum held his cell phone up, apparently recording his entrance.  He also appeared to continue recording as he walked down the hallway.



Image 3 - Borum in the Parliamentarian hallway on the Northwest side of the Capitol
Building

Shortly after, uniformed police officers, including reinforcements from the Washington
Metropolitan Area Transit Authority ("WMATA") police responding to the riot and breach of the
Capitol, entered the hallway.   Officers used crowd control techniques – including firing
"pepperballs" toward the crowd of people in the hallway and pushing forward in a line formation
– to force the mob of rioters in the Parliamentarian hallway out of the building.



Image 4 - Borum and the mob being forced out of the  Parliamentarian hallway by police

  Only following this coordinated police effort did Borum turn around and return to exit the Capitol Building through the door he had previously entered.  Borum exited the Capitol Building at 3:01 p.m.



Image 5 - Borum exiting the Parliamentarian hallway and Capitol Building

*Borum's Interviews with the FBI*

Borum consented to and participated in three interviews with the FBI on December 8, 2021, December 13, 2021, and February 11, 2022. During the interviews, Borum appears to have been candid in the discussion of his activities and motivations relating to the events of January 6, 2021.

During the interviews, Borum admitted to having seen and heard the commotion on the south side of the Capitol, observed the fence around the Capitol lawn area, saw rioters on the steps and on the scaffolding surrounding the Capitol, and personally observed bike rack barricades that had been pushed to one side. He nevertheless continued up to the Upper West Terrace where he observed police present on the scene. He stated, consistently through multiple interviews, that he entered the Capitol Building only to look for another member of his group who was unaccounted

8

for and left immediately following direction from police inside the building and the deployment of pepper balls.[3]

Borum followed up with the FBI and provided identification and personal contact information for individuals within the American Regulators whom he had knowledge of.

<div align="center"><em>The Charges and Plea Agreement</em></div>

On June 24, 2024, the United States charged Borum by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On August 23, 2024, pursuant to a plea agreement, Borum is expected to plead guilty to Counts Three and Four of the Information, charging him with violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). By plea agreement, Borum agreed to pay $500 in restitution to the Architect of the Capitol.

## III.      Statutory Penalties

Borum now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds) and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). As noted by the plea agreement, the defendant faces up to six months of imprisonment and a fine of up to $5,000 for each count. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[3] Closed Circuit Television ("CCTV") and third-party video footage both belie Borum's assertion that he entered the Capitol Building only to look for another member of his group.  As shown in Images 2 and 3 above (screenshots from such video footage), Borum did not enter the Capitol Building looking around frantically, shouting out anyone's name, or engaged in any behavior indicative of him looking for a lost acquaintance – instead, as he entered the building and walked down the hallway, video indicates that he was attempting to use his cell phone to record/memorialize his entrance.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 36 months' probation, 30 days' incarceration, 60 hours of community service, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Borum's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Borum, the absence of violent or destructive acts is not a mitigating factor. Had Borum engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Borum's case is his preparation for and kitting out as required for his role as "security" within the American Regulators.  Borum was not swept up into the fray; he intentionally proceeded to the Capitol and was attired in, essentially, a tactical uniform. Advancing on and into the Capitol as some type of paramilitary "security" cannot be condoned and must be punished and deterred.[4]

---

[4] *United States v. Speed*, No. 22-CR-244-TNM (D.D.C.) (March 7, 2023) ("I think the defendant did engage in disruptive conduct. I make this finding not based on any shouting or other notable actions by the defendant alone, but, rather, for his knowing and intentional participation in a mob that broke into the Capitol. As I see it, even though his conduct in isolation wasn't terribly

Additionally, Borum only turned around and exited the Capitol Building *after* police reinforcements arrived and used crowd control tactics to force him and the mob of rioters out of the Parliamentarian hallway. The fact that Borum was physically forced to leave the hallway differentiates him from, and makes him more culpable than, other rioters who stayed in the Capitol Building for only a few minutes because they chose to leave of their own volition.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration and supervision under probation in this matter.

### B. Borum's History and Characteristics

Borum is a married, thirty-nine-year-old preaching pastor at Windfall Christian Church in Windfall, Indiana. He has two prior convictions, both out of Indiana:

- August 2016 – Operating Vehicle w/ Alcohol Concentration Equivalent to .15 of Alcohol

  o Sentence: 180 days imposed; 178 days suspended, 180 days probation

- December 2013 – Possession of Marijuana, Hash Oil, Hashish

  o Sentence: 365 days imposed; 363 days suspended

Borum previously served as an active Army enlisted serviceman (July 2003 - July 2006) and was honorably discharged from the Army Reserves in March of 2011. While Borum's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Borum was well aware persons are not permitted to enter restricted government buildings without authorization. As a result, his voluntary decision to join in a riot storming a guarded government building is disturbing. In this case, Borum's conduct, especially his paramilitary attire

---

disruptive, a mob in the Capitol is almost inherently disruptive, and the defendant intended this disruption by joining that mob.")

while entering the Capitol paired with his former military service demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of at least some term of incarceration. Borum's behavior involved not just one poor decision, but a series of poor decisions – instead of leaving D.C. or attending another permitted rally after hearing the former President's speech, Borum entered restricted Capitol grounds dressed for violence; instead of turning around after he personally saw various warning signs that he should not approach the Capitol grounds and building (including fencing, barricades, and chaotic scenes), he continued to make his way onto restricted Capitol grounds and into the building, joining the numbers of the mob;[5] and instead of leaving the building immediately after he entered, he stayed inside the Capitol Building until he and the mob were physically forced out of the Parliamentarian hallway and fire door by officers.  This series of poor decisions suggests a greater need for deterrence than if Borum had simply had one spontaneous bad moment.

Also, the Government is aware that Borum has expressed his intent to give a statement of remorse about January 6 to his Church that will be posted to the Church's livestream; however, to the Government's knowledge, this is the first public statement Borum has made or will have made to denounce his actions on January 6, 2021, and it comes over three years after the event and shortly before sentencing. The Court should view any remorse Borum expresses shortly before or at sentencing with skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr.

---

[5] *United States v. Chan*, No. 21-CR-668-TNM (D.D.C.) (January 24, 2023), Sentencing Tr. at 15-16 ("Of course, part of the danger of mobs is the sheer volume of people. Had [the defendant] or any one of his fellow rioters been in the Capitol alone, they could have quickly been dealt with by the police. [The defendant] by his presence and actions was also acting to protect and insulate the other rioters from arrest.").

10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). And while Borum did accept g responsibility in this matter by engage with the FBI, and entering into the operative plea agreement here, those actions do not excuse his previous conduct, especially in light of his previously sworn oath to protect and defend the Constitution and our Republic.

The Court must sentence Borum in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Borum based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Borum is expected to plead guilty to Counts Three and Four of the Superseding Information, charging him with Disorderly Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable (and illustrative) comparisons to the relevant sentencing considerations in this case.

In *United States v. Villanueva*, No. 1:24-cr-00016-TNM (D.D.C.), this Court sentenced Villanueva to 24 months' probation and four months incarceration, along with $500 restitution. Like Villanueva, Borum engaged with the FBI and was apparently candid, has ties to the community and entered into a pre-charge plea with the Government. Unlike Villanueva, who stayed in the Capitol for almost half an hour and joined rioters confronting a police line before leaving Capitol Grounds, Borum was inside for approximately five minutes and departed following police instruction and pepper ball deployment. However, also unlike Villanueva, who was casually dressed in jeans, a heavy coat, and sneakers, Borum was intentionally present on the Capitol Grounds as "security" and was in tactical gear, including a vest and helmet. The Government's lower recommendation here considers the less egregious conduct displayed by Borum than that seen in *Villanueva* while still accounting for the unsettling fact of Borum's tactical attire and associate actions as a veteran of our armed forces. Both instances called for, and the Court should enter, here, imposition of a period of incarceration paired with a period of probation.

15

In *United States v. Kramer*, 1:21-cr-00413-EGS (D.D.C.), Judge Sullivan sentenced the defendant to thirty (30) days of incarceration, a fine of $2500.00, and restitution in the amount of $500.00.  This sentence was, like Borum's, imposed on a 40 U.S.C. § 5104(e)(2)(G) plea.  Also like Borum, Kramer: (1) expected to meet violence in Washington, D.C. and, consistent with that expectation, wore tactical gear (brought a helmet, a strap with a master lock attached to it, and a cane to the Capitol); (2) filmed chaos while at the capitol (he saw a crowd physically confronting officers of United States Capitol Police ("USCP") on the west front of the Capitol and filmed the interaction with his cell phone), and (3) remained inside the Capitol until he and other rioters were forced to leave when police officers began spraying the crowd with pepper-spray.  Here, Borum too wore tactical gear, apparently filmed while at the Capitol, and entered and did not leave the Capitol until less-than-lethal munitions were used on the crowd.  However, Kramer, also took a "do not enter sign", and traveled a little further into the Capitol than Borum was able to.  This is reflected in the Government's recommendation, here, of no fine, compared with the fine imposed against Kramer.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Borum must pay $500 in restitution, which reflects in part the role Borum played in the riot on January 6.[8] Plea Agreement at ¶ 11 (p.6). As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Borum's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.[9]

## VI.    Fine

The defendant's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G) subject him to a statutory maximum fine of $5,000 for each count. *See* 18 U.S.C. § 3571(b)(6). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus the Court has authority to impose a fine.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the Government recommends that this Court sentence Borum to thirty (30) days' incarceration on Count Three and 36 months' probation on Count Four. The Government also

---

[9] *United States v. Council*, No. 21-CR-207-TNM (D.D.C) (Dec. 12, 2022), Sentencing Tr. at 61 ("I note that the Government is seeking restitution, not for the officer, but for the damage done to Congress, to the Capitol Building. And even though there's no evidence that the Defendant specifically sought to destroy property, his actions were part of the harms being done against Congress here.")

requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Borum's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    *s/ Patrick Holvey*
PATRICK HOLVEY
DC Bar No. 1047142
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-252-7224
Patrick.Holvey@usdoj.gov

</div>